FILED
United States Court of Appeals
Tenth Circuit

March 18, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LANCE KEITH MAYTUBBY, SR.,

    Defendant - Appellant.

No. 23-7084

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:21-CR-00352-RAW-1)**
_____

Josh Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Lisa C. Williams, Special Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

After confessing to sexually abusing his nieces, Lance Maytubby moved to suppress his confession as involuntary, arguing that the interrogating officer's offer to write a "mitigation report," combined with the officer's

supposed suggestion that Maytubby could receive counseling in lieu of prison, overbore his will. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.     Factual Background

In December 2020, Officer T.J. White, the assistant police chief in Calera, Oklahoma, called Lance Maytubby and asked him to come to the police station to answer some questions. Maytubby agreed and arrived at the station that evening. The full interview was videorecorded via Officer White's body camera.

The interview took place in the break room at the police station, and Officer White left the door wide open. Officer White told Maytubby that he did not have to talk, that he was not under arrest, and that he could leave at any time. Then he told Maytubby that two of Maytubby's nieces, R.L. and Z.L., had accused Maytubby of sexually abusing them about four years ago while they were about eleven or twelve years old. In a friendly and reasonable tone, Officer White sought Maytubby's side of the story.

Maytubby denied the accusations, but Officer White continued to ask questions. Officer White asked why the girls would make these detailed allegations if they were untrue.[1] He told Maytubby that the two nieces' stories

---

[1] The details of the allegations are not relevant to this appeal.

2

were "dead-on similar," that neither knew the other had reported the sexual abuse, and that the accusations had "stuff to back it up." R. supp. vol. I, at 9:21–9:23, 12:08–12:29; *see also id.* at 13:48–14:03, 22:33–22:55. Then Officer White suggested that an "excuse" might explain what had happened, something like a mental-health issue, drinking, or drug use. *Id.* at 9:25–9:37, 14:08–14:24. But Maytubby continued to deny the accusations.

About one minute later, Officer White stated that he needed to deliver an investigation report to the district attorney. He told Maytubby that he wanted the report to include all mitigating circumstances, like that Maytubby was a pastor who had made a mistake, had long been a "working man" and "family man," and had just "acted out of character." *Id.* at 15:43–16:01. Officer White said that the other people he'd interviewed said that Maytubby was "a good guy, and [] an honest guy and that [he had] a good heart." *Id.* at 16:05–16:22. Maytubby asked, "So what's the difference? I mean, it's going to be the same [whether it was out of character or not], right?" *Id.* at 17:45. Officer White responded:

> No, no there are people in this world that that is their M.O., that's what they do. That's what turns them on, is little kids, little girls or little boys, or whatever the case is. That that's their thing and their goal in their life is just to go and get as many of these people as they can. And then there's people that are drinking or on drugs or whatever that just are messed up on something or had a slipup and the next morning was like crap, I can't believe I did that, I don't believe that happened. You know, that it's not part of their DNA that it's not part of their character, but it happens. And of course once you ring a bell you can't take the ding back. And all you can do is be sorry for it and you know, ask God for forgiveness on it. You're

a religious man, you know, that's by your own admission so I'm not trying to push my religion on you, but I, that's how I deal with stuff, I'll pray on it and ask for God's forgiveness and I'll ask for guidance and to making everybody better, making the situation better. That's, that's mine. You may be different with how you talk to God or if you talk to God at all. But I think it happened, I don't think you're that kind of guy and I think that it's something that you've probably been struggling with. Those girls struggle too. And I don't think that they deserve to struggle. I don't think you deserve to struggle. I think it's something that everybody needs to get past, get into some counseling, and move on with life. Cause can't nobody just sit on this kind of stuff, it would, I know it would eat me up. But those girls are, those girls need to get on with their life just the same as you do. And I need to do my best to try to help along everybody getting closure. You know? Because stuff happens. Stuff happens.

*Id.* at 17:49–20:17 (cleaned up).

Officer White again said that he wanted to report that Maytubby made a mistake and that he was not "any kind of predator" and that the behavior "hasn't happened since." *Id.* at 20:17–20:27, 23:02–23:14. Maytubby continued to deny the accusations. Officer White explained that Maytubby's denials put Officer White in a difficult spot in reporting to the district attorney. He reminded Maytubby that Maytubby didn't need to speak to him, and he reassured Maytubby that he was not going to arrest him that day. But Officer White also stated that his desire to include mitigating information in the investigative report depended on Maytubby's admitting his sexual conduct with his nieces: "I can't help you out if you're not honest to me, I just can't. I can't go in there and say, . . . 'Hey, he manned up. This is how it is. The guy acted out of character.'" *Id.* at 23:19–23:44.

Then Maytubby said that he wanted to go home. Officer White said, "Okay." *Id.* at 23:45. Then Maytubby said, "Okay, I'm going to say 'yes.'" *Id.* at 23:48–23:51. Officer White said, "What do you mean? . . . You did do these things?" *Id.* at 23:50–23:53. Maytubby responded, "Yes." *Id.* at 23:53. Officer White asked if Maytubby was telling the truth, and Maytubby said, "Yeah." *Id.* at 23:55.

Maytubby requested that he not be arrested at his workplace and that he be permitted to go home to talk to his wife and family. As promised, Officer White let Maytubby leave and even commented that he might not be arrested at all, because "it's in the hands of the DA." *Id.* at 24:43–24:54. Then Officer White said, "You being honest with me is going to go leaps and bounds in your favor." *Id.* at 24:55–25:02.

## II.     Procedural History

Maytubby was indicted for three counts of aggravated sexual abuse in Indian Country in violation of 18 U.S.C. §§ 2241(c), 2246(2)(A)–(B), (D), 1151 & 1153; two counts of sexual abuse of a minor in Indian Country in violation of 18 U.S.C. §§ 2243(a), 2246(2)(A)–(B), 1151 & 1153; and one count of abusive sexual contact in Indian Country in violation of 18 U.S.C. §§ 2244(a)(5), 2246(3), 1151 & 1153. The three aggravated sexual-abuse counts were against R.L., who had not attained the age of twelve years; the two counts of sexual abuse of a minor were also against R.L., but when she had attained the age of

5

twelve years but not the age of sixteen years; and the one count of abusive sexual contact was against Z.L., who had not attained the age of twelve years.

Maytubby moved to suppress his interview statements as involuntary, arguing that Officer White's inducement (his including the mitigation factors in his investigative report to the district attorney) combined with the mention of counseling overbore his will. The district court held a pretrial suppression hearing at which Officer White testified and portions of the interview video were played. Officer White testified that he had never stated or implied that Maytubby's admissions would alter his charges or punishment.

After hearing arguments from counsel, the district court orally denied the motion to suppress. R. vol. III, at 72. The district court noted that the parties agreed on the facts but disputed whether the interrogation was so coercive as to render Maytubby's statements involuntary. In concluding that Maytubby's statements were voluntary, the district court relied on various factors set out in our caselaw, such as the short duration of the interrogation, Officer White's not being physically abusive or aggressive, Maytubby's knowledge that he was free to leave without making a statement, and the absence of any evidence that Maytubby was particularly susceptible to coercion. Regarding the specific interrogation tactics, the district court said that Officer White "was honest in suggesting that he would report to the prosecuting authority whether or not Mr. Maytubby was cooperative" and that any "suggestion of leniency" did not

amount to "such coercion as to overcome Mr. Maytubby's free will." *Id.* at 71–72.

After a four-day trial, a jury convicted Maytubby of the three counts of aggravated sexual abuse against R.L. and the one count of abusive sexual contact against Z.L.; the jury acquitted Maytubby of the two sexual-abuse counts against R.L. while she was between the ages of twelve and sixteen. The prosecution emphasized Maytubby's confession in proving its case.

The court sentenced Maytubby to the advisory-guidelines sentence of life in prison and entered final judgment. Maytubby timely appealed.

## STANDARD OF REVIEW

In reviewing a district court's order denying a motion to suppress, we accept the district court's underlying factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the district court's determination. *United States v. Lopez*, 437 F.3d 1059, 1062 (10th Cir. 2006). We review de novo "the ultimate issue of whether a statement was voluntary" as a question of law. *Id.* (quoting *United States v. Minjares-Alvarez*, 264 F.3d 980, 984 (10th Cir. 2001)). "The government bears the burden of showing voluntariness by a preponderance of the evidence." *United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020).

## DISCUSSION

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const.

amend. V. For an incriminating statement to be voluntary, it must not be "the product of coercion, either physical or psychological." *Young*, 964 F.3d at 942 (internal quotation marks omitted). Coercion may take the form of "acts, threats, or promises which cause the defendant's will to be overborne." *Lopez*, 437 F.3d at 1063 (internal quotation marks omitted). We consider the totality of the circumstances surrounding the confession and view those circumstances from the defendant's perspective. *Young*, 964 F.3d at 942, 944. Some factors that we consider include "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Lopez*, 437 F.3d at 1063–64 (internal quotation marks omitted). More generally, we consider "both the characteristics of the accused and the details of the interrogation." *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002). "[T]he importance of any given factor can vary in each situation." *Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015).

I.    *Lopez* **Factors: Characteristics of Maytubby and the Interrogation**

The interview was recorded on Officer White's body camera, and the parties do not dispute any of the facts about the interview. Maytubby went to the police station voluntarily, and Officer White told him that he could leave at any time and that he did not have to make a statement. Officer White did not advise Maytubby of his *Miranda* rights, but Maytubby was not in custody so

8

*Miranda* warnings were not required. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The interview lasted less than thirty minutes. The tone of the interview was conversational. The physical environment was not coercive—it occurred in a break room with the door open. The interview included no physical punishment. And nothing about Maytubby's age, intelligence, or education made him particularly susceptible to coercion. All these factors weigh in favor of finding a voluntary confession.

## II.    Other Factors

Maytubby argues that the above factors are outweighed by Officer White's offer to include mitigating facts in his investigative report to the district attorney if he admitted his nieces' accusations. He also says that Officer White suggested that Maytubby might be able to attend counseling in lieu of prison. He likens his case to *Young* and *Lopez*, where we found that a powerful inducement (a promise of leniency) combined with a misrepresentation (of the law or evidence) rendered the confessions involuntary.[2] *See Young*, 964 F.3d at 943–44, 946 (holding confession involuntary where agent promised that Young could reduce the length of his sentence with each truthful response, misrepresented the length of the potential sentence, and claimed personal influence with the federal district judge); *Lopez*, 437 F.3d at 1064–66 (holding

---

[2] Maytubby does not argue the offer to provide mitigating facts to the prosecutor amounted to a "promise of leniency" and asserts "he is not required to show [] that Officer White's inducement took [that] particular form." Reply Br. at 5–6.

confession involuntary where agent exaggerated the evidence and told Lopez to choose between a sentence of six or sixty years, functionally promising a shorter sentence by 54 fewer years if Lopez confessed). He asserts that *Young* and *Lopez* stand for the proposition that a powerful inducement combined with a misleading statement suffices to render a confession involuntary.

During the interrogation, Officer White said, "I want to be able to [tell the prosecutor] look, Lance is a working man . . . he's got a family, he's a family man, he's a pastor and he just acted out of character." R. supp. vol. I, at 15:44–16:01. Maytubby does not argue that this statement was false, but says it was coercive because offering a report that downplayed Maytubby's misconduct and portrayed him sympathetically was a powerful inducement that overbore his will. We disagree.

Officer White's interview statements were proper. Nothing suggests that Officer White lied, and we see nothing unusual about an investigating officer advising a prosecutor of mitigating facts and circumstances related to an investigation. *Cf. United States v. Perez*, 127 F.4th 146, 176 (10th Cir. 2025) (finding no coercion after determining that the agent's statement was "no more than a commonsense statement of fact"). Cooperating with the investigation had the potential to benefit Maytubby. And critically, Officer White's statements lack the most concerning characteristic from *Young* and *Lopez*—the implication that the officers had control over the sentence. *See Young*, 964 F.3d at 943–44, 946 (agent told Young that he could "physically buy down" the length of his

sentence with each truthful response); *Lopez*, 437 F.3d at 1064–65 (agent told Lopez to choose between a sixty-year sentence for murder and a six-year sentence for a mistake).

In this way, Officer White's statements were a limited assurance—a general statement about the benefit of cooperating—which we have repeatedly held to be a permissible interrogation tactic. *See United States v. Rodebaugh*, 798 F.3d 1281, 1293 (10th Cir. 2015) (holding that the "vague and non-committal" statement of "[i]f you work with us, we'll go easy on you" was a limited assurance that did not prevent the defendant from "freely and rationally choos[ing] among the available courses of action" (internal quotation marks omitted)); *United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994) (concluding that the agent's promise to make the defendant's cooperation known to the prosecutor was a limited assurance that did not taint the confession). Though Maytubby is correct that Officer White provided specifics about what he would tell the prosecutor, Officer White also acknowledged that leniency was in the prosecutor's control. *See United States v. Lux*, 905 F.2d 1379, 1382 n.2 (10th Cir. 1990) ("Because [the defendant] was properly informed that the United States Attorney was the only official with control over [the case], [the agent's] remarks did not constitute an implied promise.").

Maytubby argues that Officer White's statements left Maytubby believing that he could receive counseling in lieu of a prison sentence. But though "we view the coercive nature of assertions from the standpoint of the defendant,"

*Young*, 964 F.3d at 944, Maytubby had no reason to believe that Officer White was offering counseling in lieu of prison.

First, Officer White never even hinted that he had authority or control over Maytubby's sentence. *Cf.* R. supp. vol. I, at 14:44–15:00 ("I'm not a judge, I'm not the prosecutor, so . . . I'm not gonna say that I for sure have this, and I for sure have that, but again I've been doing this twenty years and I've sure gotten arrest warrants with less."). Second, Officer White's mention of counseling related to the personal and spiritual handling of guilt: "[To] deal with stuff, I'll pray on it . . . and I'll ask for guidance and to mak[e] everybody better, mak[e] the situation better. That's, that's mine. You may be different . . . ." *Id.* at 18:35–19:15 (cleaned up). No reasonable person, Maytubby included, would understand a statement like "all you can do is be sorry for it and you know, ask God for forgiveness on it," *id.*, as an alternative to criminal prosecution for sexually abusing a child. And it was with that backdrop that Officer White said, "I think it's something that everybody needs to get past, get into some counseling, and move on with life. Cause can't nobody just sit on this kind of stuff, it would, I know it would eat me up." *Id.* at 19:43–19:58. In context, the counseling statement was about the emotional toll that sexual abuse has on the people involved. We see no reason why Maytubby would understand these statements as offering counseling in lieu of prison.

Indeed, context shows that Maytubby did not consider the statements about counseling to be a bargain for admitting his crimes. For starters,

Maytubby continued to maintain his innocence after Officer White mentioned counseling. And Maytubby's statements show that he knew he faced criminal consequences—he contemplated an impending arrest, asking that he not be arrested at his workplace and that he be given time to go home to talk to his wife and family. He knew he wasn't just getting counseling.

Finally, Maytubby argues that Officer White's "high-pressure sales tactic[s]"—telling Maytubby that he needed to prepare and deliver a report to the prosecutor "now" and that he would "just go with" whatever Maytubby decided to "leave with"—increased the pressure for Maytubby to confess. Reply Br. at 14; Op. Br. at 17. We disagree.

Officer White told Maytubby that "I'm to a point now to where I've got to put everything together and get it sent to the DA." R. supp. vol. I, at 15:37–15:43. He explained that he had already interviewed Maytubby's nieces and other family members. *See id.* at 16:06–16:14 ("You're not the first one I've talked to, I promise ya. I've talked to a lot of people this week."). Telling Maytubby that he was at the end of his investigation and that it was time to submit the investigative report to the prosecutor was not a "high-pressure sales tactic," it was a truthful statement about how an investigation progresses.

When Maytubby continued to deny the allegations, Officer White reminded Maytubby that he "wasn't going to jail [him] tonight" and that Maytubby didn't have to speak with him, but if the denials were what Maytubby wanted to "leave with," Officer White would not be able to tell the

13

prosecutor that Maytubby "manned up" and "acted out of character" and would "just [have to] go with the evidence that [he had]." *Id.* at 22:20–23:08, 23:37–23:43. These are commonsense statements. Officer White could not tell the prosecutor that Maytubby admitted guilt if Maytubby did not admit guilt; he could not tell the prosecutor that Maytubby just acted out of character if Maytubby insisted that he did not act at all; and Officer White could not rely on anything but the evidence he already had if Maytubby did not provide any additional evidence. With full context, these true, isolated statements, said in a conversational tone, do not convey a sense of immediacy or urgency.

Considering all the above factors, we conclude the interview was not coercive.

### III. Effect on Maytubby

Nothing in Officer White's interview improperly induced a confession. Almost twenty-four minutes into the interview, Maytubby abruptly admitted Officer White's accusations. Maytubby argues that he did so only after Officer White made it clear that including mitigation facts in the investigative report (and therefore any benefits accompanying such a report) depended on Maytubby's doing so. Maytubby notes that only thirty seconds passed between Officer White's saying that "I can't help you out if you're not honest to me" and Maytubby's admission. *Id.* at 23:19–23:49. But those thirty seconds were not silent. During them, Maytubby sought assurance that he would not be arrested if he chose to leave the police station. Right after Officer White stated

14

that he could not help Maytubby unless Maytubby was honest with him, Maytubby said, "Well, then I can go home right now, right?" *Id.* at 23:43. Officer White said, "Okay." *Id.* at 23:44–23:45. Less than five seconds later, Maytubby summarily acknowledged the truth of his nieces' accusations. *Id.* at 23:48–23:51. This assures us that Maytubby's fear of immediate arrest played a large part in his earlier denials of wrongdoing. We conclude that Officer White did not overbear Maytubby's free will or "critically impair[]" Maytubby's "capacity for self-determination." *Perez*, 127 F.4th at 171 (internal quotation marks omitted).

## CONCLUSION

In context, none of Officer White's statements were coercive, and Maytubby's will was not overborne. Maytubby's confession was voluntary. We affirm.